UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE


John Ingalls

     v.                             Civil No. 10-cv-242-PB

Walgreen Eastern Co., Inc.


**O R D E R**


In this diversity action, plaintiff asserts two claims against his former employer, Walgreen Eastern Co. ("Walgreens" or "defendant"): wrongful termination (Count I) and intentional infliction of emotional distress (Count II).  Before the court are plaintiff's motions to compel (doc. nos. 9 & 10).  For the reasons explained below, document no. 9 is granted in part and denied in part; document no. 10 is denied.[1]


## I. **Background**


Except where noted, the factual background is drawn from plaintiff's complaint and memoranda related to his motion to

---

[1] Document No. 9 is the central discovery motion before the court, in which plaintiff seeks an order compelling Walgreens to provide certain discovery.  Document No. 10 is a motion to compel a non-party, the New Hampshire Board of Pharmacy, to provide a subset of records related to the central discovery dispute at issue between the parties.  Unless specifically noted, the court refers herein to plaintiff's central discovery motion (doc. no. 9) as the plaintiff's "motion to compel."

compel.  Plaintiff worked for Walgreens from February 12, 2001,
through March 26, 2010, the date on which Walgreens terminated
him.  In 2004, Walgreens promoted plaintiff to the position of
manager of its Rochester store, and for the next five years,
from 2004 through 2009, plaintiff received positive performance
reviews in every possible job performance category.  Until
plaintiff's termination, Walgreens had not disciplined him in
any way, or even warned him about his job performance.  Rather,
throughout his work history, plaintiff received both praise and
salary increases for managing stores with among the highest
revenue and earnings in his district and the country.

     In July 2006, following a rain storm, the roof of the
Walgreens store in Exeter collapsed.  Walgreens-Exeter
transferred some of its inventory to other local stores,
including the store plaintiff managed.  Plaintiff alleges that
he became aware of wrongdoing on the part of Walgreens employees
during this incident.

     The alleged wrongdoing takes various forms.  Plaintiff says
that Walgreens claimed the damage to its Exeter store as a
"total loss" for insurance purposes but that, in fact,
Walgreens-Exeter did not suffer a "total loss" from the
incident, and instead, transferred a portion of its inventory to
other stores for sale.  This occurred despite the fact that the

Exeter Health Inspector had condemned the store's inventory. Plaintiff also alleges that Walgreens violated its own internal policies and procedures by not completing certain required forms and disposing of the damaged inventory in accordance with its policies.  And, perhaps most seriously, plaintiff alleges that Walgreens violated state and federal laws by transferring for sale both tobacco and pharmaceutical products out of its Exeter store to other nearby stores.

During the Walgreens-Exeter incident, plaintiff claims that Anne O'Herren, his district manager, instructed him not to share with anyone the fact that Walgreens-Exeter was going to transfer condemned inventory and sell it at the store he managed in Rochester.  According to plaintiff, O'Herren then loaded her minivan with inventory, including tobacco products, and directed employees to drive it the Rochester store, where it was unloaded, shelved and offered for sale.  Plaintiff alleges that two other stores (one in Epping and the other in Lowell, Massachusetts) also received condemned inventory from Exeter.

According to plaintiff, following the incident in Exeter, he heeded O'Herren's instructions to "keep his mouth shut" and continued to prosper as a store manager.  However, in 2009, Walgreens made changes to its management team and restructured the way it calculated certain employee bonuses.  This change had

3

a negative impact on the bonuses that plaintiff and his
assistant managers received.  Plaintiff voiced his disagreement
with the changes to members of the Walgreens upper management.

     In February 2010, Caroline Morgan, who held the title of
"community leader," took over as the manager of a store that
plaintiff had previously managed.  Doc. No. 13.  Shortly after
her arrival, Morgan became concerned about how plaintiff had
managed the store.  Id.  Specifically, Morgan learned that
plaintiff had violated Walgreens' policy regarding mandatory in-
store, computer-based, employee training.  Id.  This training
was mandated because it concerned regulated matters, such as
tobacco sales and sexual harassment.  Id.  Morgan also
discovered that plaintiff had maintained several "house
accounts" at the store (i.e., he allowed customers to take
merchandise but be billed later), but did not maintain the
proper documentation for those accounts.  Id.

     Understanding the things she discovered to be serious
violations of Walgreens policies, Morgan contacted Walgreens'
loss-prevention department.  Id.  The loss-prevention department
conducted a formal investigation that confirmed Morgan's
concerns, and uncovered other problems.  Id.  During the
investigation, employees of the store reported that plaintiff
often permitted hourly employees to work "off the clock," and

had altered time cards to avoid having to pay overtime.  Id.
These employees signed written statements confirming these
facts.  Id.

While the investigation was underway, at some point in
early March 2010, plaintiff met with Morgan, who still served as
his "community leader."  The complaint does not indicate whether
plaintiff was aware at that time that an investigation of his
former store was underway and/or that Morgan played a role in
that investigation.

During the meeting, plaintiff complained to Morgan about
the negative changes in Walgreens' management.  According to
plaintiff, Morgan asked him if he was concerned about his job
security.  Plaintiff told Morgan that he was not concerned
because he "knew too much" about wrongdoing within the company
to be fired.  Plaintiff alleges that he explained to Morgan that
he was aware of Walgreens having committed insurance fraud in
the aftermath of the Walgreens-Exeter roof-collapse incident.

On March 26, 2010, plaintiff admitted to the Walgreens
loss-prevention investigator, and to his own supervisor, Gregory
Paramantgis, that he had committed the misconduct uncovered by
the investigation.  Doc. No. 13.  Plaintiff signed a written
statement confirming his admissions.  Id.  On that date,
Paramantgis terminated plaintiff's employment.  Id.

Plaintiff contends that Walgreens' stated reason for his termination (i.e., violation of federal and state wage-and-hour laws, as well as company policies) is a pretext for the real reason (i.e., his refusal to remain silent about Walgreens' illegal conduct).  Plaintiff contends that Walgreens' real reason for terminating him violates public policy and constitutes a wrongful termination.

Walgreens contends it terminated plaintiff due to his admitted violations of certain Walgreens' policies and state and federal wage and hour laws.  Doc. No. 13.  Walgreens asserts that plaintiff, by his own admission, "doctored" employee time cards so as not to record earned overtime.  According to Walgreens, plaintiff admitted that he permitted one employee to work "off the clock" for ten hours per month for three years. Id.

The vast majority of interrogatories and documents that are the subject of this motion to compel relate to two broad categories of evidence: (1) evidence of Walgreens' policies (and training of its employees about those policies); and (2) evidence substantiating the alleged wrongdoing during the 2006 roof collapse at Walgreens' Exeter store.  With respect to the former, plaintiff contends that he is entitled to evidence tending to prove that Walgreens did not view the policies (which

it terminated him for violating) as grounds for termination, and indeed, trained its employees and supervisors in a manner that encouraged them to violate those policies.  With respect to the second category of evidence, plaintiff contends that proof of Walgreens' actual wrongdoing during the 2006 roof collapse will make it more likely that the jury will find Walgreens' stated reason to be a pretext.

## II. <u>Legal Analysis</u>

"Unless otherwise limited by court order, the scope of discovery . . . [extends to] any nonprivileged matter that is relevant to any party's claim or defense -- including the existence, description, nature, custody, condition, and location of any documents . . . .  Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1).  A party seeking broader discovery, that is, discovery of "any matter relevant to the subject matter involved in the action," is required, under the rule, to show "good cause."  <u>Id.</u>; <u>see</u> <u>also</u> <u>In re Subpoena to Witzel</u>, 531 F.3d 113, 118 (1st Cir. 2008).

The court "must limit the frequency or extent of discovery otherwise allowed" where it determines that:

(i) the discovery sought is unreasonably cumulative or
duplicative, or can be obtained from some other source
that is more convenient, less burdensome, or less
expensive;

(ii) the party seeking discovery has had ample
opportunity to obtain the information by discovery in
the action; or

(iii) the burden or expense of the proposed discovery
outweighs its likely benefit . . . .

Fed. R. Civ. P. 26(b)(2)(C).

"The purpose of pretrial discovery is to make trial less a
game of blindman's bluff and more a fair contest with the basic
issues and facts disclosed to the fullest practicable extent."
Wamala v. City of Nashua, No. 09-cv-304-JD, 2010 WL 3746008, at
*1 (D.N.H. Sept. 20, 2010) (internal quotation marks omitted).
In this court, the party moving to compel discovery over an
adversary's objection bears the burden of showing that the
information he seeks is relevant and not privileged.  Id. at *2;
Saalfrank v. Town of Alton, No. 08-cv-46-JL, 2009 WL 3578459, at
*3 (D.N.H. Oct. 27, 2009).

Plaintiff contends that the evidence he seeks is relevant
to his wrongful discharge claim.  "Under New Hampshire law, the
claim of wrongful termination exists as a judicially crafted
exception to the common law doctrine of employment at will."
Melvin v. NextEra Energy Seabrook, LLC, No. 09-cv-249-JD, 2010
WL 99095, at *2 (D.N.H. Jan. 6, 2010) (citing Harper v.

8

Healthsource N.H., Inc., 140 N.H. 770, 774 (1996)).  A wrongful termination claim has two elements.  Id.  "In order to prevail, the plaintiff must establish '(1) that his termination was motivated by bad faith, retaliation or malice; and (2) that he was terminated for performing an act that public policy would encourage or for refusing to do something that public policy would condemn.'"  Id. (quoting MacKenzine v. Linehan, 158 N.H. 476, 480 (2009)) (brackets omitted).

With these principles as a backdrop, the court turns to plaintiff's discovery request.

### III. Plaintiff's Motion to Compel

A.  Discovery related to the 2006 Exeter roof collapse and Hurricane Katrina

Three of plaintiff's interrogatories (nos. 10, 20, and 21) and nine of his requests for the production of documents (nos. 1, 2, 4, 7, 8, 9, 20, 21, and 22) relate to the 2006 Exeter roof collapse and defendant's actions in the aftermath of Hurricane Katrina.[2]  Plaintiff is not entitled to the evidence he seeks by means of those discovery requests.

Plaintiff argues that he is entitled to that material in support of his wrongful termination claim.  In order to assess

---

[2]Plaintiff's motion to compel (doc. no. 10) seeks discovery related to the 2006 Exeter roof collapse.

9

the relevance of the evidence plaintiff seeks, it is first necessary to characterize his claim.

In Count I of his complaint, plaintiff alleges that he was terminated "because he . . . identified several of the Company's past and/or present illegal and/or fraudulent conduct to his direct supervisor," Complaint ("Compl.") ¶ 52, or, in the alternative, "because he performed an act that public policy would encourage including, but not limited to, identifying the Company's potentially fraudulent and/or criminal conduct to his supervisor," Compl. ¶ 53.  In the factual section of his complaint, plaintiff describes the conversation between himself and his community leader that, in his view, led to his termination:

> Ingalls mentioned that he had complained to the Vice President about how new company policy was adversely affecting his subordinate employees.  The Community Leader asked if Ingalls' [sic] was worried about his job.  Ingalls responded that he had been involved in too much activity and knew too much about things that occurred within the Company to be fired.

> The Community Leader inquired about the specifics.  Ingalls then explained what occurred with the collapse of the Exeter store, inventory being moved to his store, and the possibility that the Company committed insurance fraud by claiming the inventory as an insurance loss but then selling it in other stores.  Ingalls also mentioned conduct that occurred during inventory counts within both pharmacies and stores.

> At the time of this conversation, Walgreen had never disciplined Ingalls in anyway [sic].

Three weeks later, Walgreen terminated Ingalls' employment.

Compl. ¶¶ 42-45.

In his motion to compel, plaintiff characterizes Count I in the following way: "Ingalls contends . . . that during this discussion he mentioned to Morgan (referring to the transfer of inventory from the Exeter store) that he knew information about Walgreen committing 'insurance fraud' and that Walgreen would not terminate his employment because then he might have to report what he knew to the IRS and ATF." Doc. No. 9 at 7.  Not to put too fine a point on it, this is not a case about an employer telling an employee that if the employee disclosed what he knew, he would be fired; this is a case in which a former employee told his employer that if the employer fired him, he would disclose what he knew.  So, on the facts alleged by plaintiff, he was not fired because of what he knew about the Exeter incident, but, rather, he was fired in spite of what he knew about the Exeter incident.  In essence, on the facts alleged, and the spin plaintiff puts on those facts, he dared Walgreens to fire him, and Walgreens called his bluff.

Based on the foregoing, the evidence plaintiff seeks – which is related to proving the legality of the steps Walgreens took after the Exeter roof collapse – is not relevant to

11

plaintiff's claim in this case.  Plaintiff claims he was
terminated, in bad faith, for performing an act that public
policy would encourage, i.e., telling his supervisor about the
disposition of some of the merchandise from the Exeter store,
four years earlier, and offering his opinion that Walgreens had
acted unlawfully.[3]  In plaintiff's view, information about the
handling of inventory from the Exeter store is relevant because
it will allow him to prove the truth of the statements he made
to his community leader which, in turn, supports the bad faith,
retaliation, or malice element of his wrongful termination
claim.  Plaintiff's argument is not persuasive.

First, regarding the truth of the statements he made to the
community leader, New Hampshire's Whistleblowers' Protection Act
provides useful guidance.  Under the Act, a whistleblower need
not establish the truth of his or her accusations to be
protected; all that is required is that "[t]he employee, in good
faith, reports . . . what the employee has reasonable cause to
believe is a violation of any law or rule."  N.H. Rev. Stat.
Ann. § 275-E:1, I(a).  So, whether or not Walgreens actually
violated any law is beside the point; what matters is whether

---

[3] Whether or not public policy would encourage an employee
to threaten his employer with the disclosure of harmful
information in the event he was terminated is a question for
another day.

12

plaintiff had reasonable cause to believe that Walgreens had violated the law.

Second, the truth or falsity of plaintiff's allegations concerning Walgreen's conduct in 2006 has no bearing on the bad faith, malice, or retaliation element of his wrongful termination claim. What matters is the state of mind of the person who terminated plaintiff and, in particular, what that person believed to be the truth about the Exeter incident and Walgreens' potential liability. And, ironically, under plaintiff's own theory, if he were to prove the illegality of Walgreens' actions in 2006, that would cut against his claim that he was fired because of what he knew. That is, if Walgreens had committed illegal acts, and knew that it had done so, that would have given Walgreens a motive to keep plaintiff an employee, to keep his mouth shut, rather than a motivation to terminate him and risk the exposure of its allegedly unlawful conduct.

The bottom line is this. The evidence plaintiff seeks is simply not relevant to his wrongful termination claim. While Walgreens is a defendant in plaintiff's wrongful-termination claim, it is not on trial for tax fraud, insurance fraud, or violating federal or state tobacco laws.

The court analyzes the remaining disputed interrogatories and document requests separately below.

B.   Interrogatories

Interrogatory No. 4 (requesting Walgreens to identify and provide a copy of all training that it provided to plaintiff)

Walgreens has provided a record of the formal training that plaintiff received.  Walgreens has not provided the actual training materials and claims that it does not retain all its training materials.

Plaintiff requests all of his prior training materials without limitation as to date or subject matter.  Plaintiff has not shown how this evidence is relevant to his claim.  Nor has he shown good cause that he is entitled to it under the more liberal discovery standard.  The request is overly broad and unduly burdensome.

Interrogatory No. 6 (requesting that Walgreens identify and provide a copy of any and all changes in any policies that plaintiff allegedly violated)

Walgreens claims that it is not aware of any changes in any policies on which it based its termination of plaintiff. Plaintiff is not asking in this interrogatory for the written policies pertaining to house accounts, or any of the other policies he was accused of violating.  Those policies would be relevant and discoverable.  Walgreens has provided those to

14

plaintiff.  Instead, plaintiff is requesting, without restriction as to dates, "any and all changes" to these policies.  Walgreens does not know of any such changes.  The request is overly broad and unduly burdensome.

> Interrogatory Nos. 14 and 16 (requesting all information regarding Leo Lariviere, and his alleged violation of Walgreens policies)

Plaintiff has failed to meet his burden to show how this information is relevant to his claim, nor has he shown that it is relevant to any other issue in the case.  Plaintiff seeks information pertaining to Mr. Lariviere's having allegedly provided his security password to other Walgreens' employees, which, plaintiff describes as an "egregious" violation of policy.  Walgreens acknowledged that Lariviere engaged in this conduct and was disciplined.  Plaintiff requests that Walgreens be ordered to provide: "who learned this information, when it was learned, and the disciplinary action."

Mr. Lariviere's violation of policy is different from that on which Walgreens based its termination of plaintiff. Moreover, it appears that plaintiff has succeeded in obtaining discovery, through deposition testimony, about Mr. Lariviere's policy violations and Walgreens' disciplinary response. Plaintiff is not entitled to any further discovery on this issue.

15

      <u>Interrogatory Nos. 22 and 23</u> (requesting all information, including all communications, such as emails and internal memoranda, regarding plaintiff's March 2010 meeting with Morgan)

      Plaintiff has already obtained discovery about this meeting through the deposition of Morgan, who apparently testified that she did not remember the conversation and that she never communicated the substance of it to plaintiff's supervisor, Paramantgis, the person responsible for plaintiff's termination.

      Although Morgan testified that she had no memory of the conversation, to the extent that Walgreens has any evidence that there was such a meeting, or that anyone within Walgreens communicated about that meeting prior to plaintiff's termination, such evidence would be relevant to plaintiff's claim that the meeting was the cause of his termination.  The court therefore orders Walgreens to provide answers responsive to these interrogatories.

C.   <u>Requests for the Production of Documents</u>

      <u>Request No. 3</u> (requesting the "punch audit trail reports" for the Rochester, Exeter, Dover, Hampton, Nashua, and West Lebanon stores)

      Punch audit trail reports are internal Walgreens documents that show manual changes made by management staff to employee time cards.  Walgreens terminated plaintiff for engaging in conduct related to manual changes to employee time cards.

Plaintiff seeks this evidence to show that altering an employee's time card was common practice.

Walgreens asserts that it was common for managers to make changes to time cards to correct errors or inaccuracies in the cards, as occurs where an employee neglects to punch in or out for a given shift. Indeed, several store managers have so testified during their depositions. According to Walgreens, however, plaintiff was terminated for "fraudulently manipulating" time cards to prevent employees from being paid earned overtime. The requested discovery would not reveal any evidence beyond that which Walgreens, and several witnesses, have provided.

The court finds that the request is duplicative, overly broad and unduly burdensome.

> Request No. 5 (requesting all emails sent by District Manager Dave White to the Rochester store from October 2008 to April 2010)

Plaintiff seeks these emails because he contends that they will contain evidence that White encouraged plaintiff to keep within payroll and avoid use of overtime. Thus, plaintiff offers this evidence to explain the pressure he felt from management to make manual adjustments (with respect to overtime) to his employees' time cards.

17

Walgreens does not dispute that White, and other supervisors, sent such emails to store managers.  Plaintiff does not allege, however, that White sent him emails encouraging him to alter an employee's earned overtime hours.

Walgreens further states that White's emails (from October 2008 to April 2010) were not preserved and, as a result, it cannot comply with the request.  Plaintiff complains that it asked Walgreens to preserve electronic evidence, but Walgreens states that the request was not made until April 26, 2010.  According to Walgreens, it has retained all electronic communications only since the date of the litigation hold.  Thus, Walgreen asserts that it has not retained the requested email records.

The court finds the request is duplicative, overly broad and unduly burdensome.

> Request No. 6 (requesting authenticator ID reports for all
> stores in the New Hampshire district for 2009 and 2010, or,
> in the alternative, whatever reports the loss-prevention
> person ran for his store, while investigating his store,
> that enabled her to discern changes to authenticator ID
> passwords for his employees)

Plaintiff contends that deposition testimony reveals that these reports are not overly burdensome for Walgreens to compile.  Plaintiff argues that this evidence will help him show that it was common practice for store managers to perform tasks

18

such as PPLs for employees, which was one basis for Walgreens'
stated termination of plaintiff.

This evidence would be relevant to plaintiff's claim that a
stated reason for his termination (performing PPLs for his
employees) was a common practice of other store managers.  The
court therefore orders Walgreens to provide documents responsive
to this request.

Request No. 15 (requesting Opening Statements for the Maine
District for the period September 2008 and 2009)

Plaintiff contends this evidence will, inter alia,
substantiate his concerns about the changes in the bonus
structure and the fact that his store was paying
disproportionate supervision charges.  This evidence is not
relevant to plaintiff's wrongful discharge claim, as it is not
related to an identifiable public policy.  However, the evidence
would tend to corroborate plaintiff's testimony, and therefore
his credibility, concerning his vocal complaints to management
shortly prior to his termination.

The court finds good cause for Walgreens to provide this
discovery, particularly where Walgreens has not explained how
this request is unduly burdensome.

Request No. 18 (requesting a copy of all documentation pertaining to "any and all reports" Walgreens received from "any and all consultants it retained at any point from 2001 to the present" to assess a store manager's job requirements)

Plaintiff bases this request on his understanding that, at one point in the past, Walgreens hired "a consultant" who concluded that it would take a store manager 132 hours in a week to perform the tasks Walgreens expected its store managers to perform.

Plaintiff has not shown how this evidence is relevant to his claim.  Nor has he shown good cause that he is entitled to it under the more liberal discovery standard.  The request is overly broad on its face and is unduly burdensome.

Request No. 19 (requesting any and all communications between district trainers and store managers regarding the completion of PPLs)

Plaintiff contends that this evidence will show that he was not alone in completing (or instructing other employees to complete) PPLs for his store employees.  Plaintiff's assistant manager, whom he allegedly instructed to complete employee PPLs, has testified that she learned how to do this from a store manager other than plaintiff.

It appears as though plaintiff has been able to obtain this kind of evidence from other sources.  Moreover, Walgreens claims that no such documents exist.

This request is not narrowly tailored.  It is overly broad
and unduly burdensome.

## IV. Conclusion

For the foregoing reasons, plaintiff's motion to compel
(doc. no. 9) is granted in part and denied in part.  Plaintiff's
motion to compel (doc. no. 10) is denied.

The following discovery requests are granted: Interrogatory
Nos. 22 and 23, and Requests for the Production of Documents
Nos. 6 and 15.  The following discovery requests are denied:
Interrogatory Nos. 4, 6, 10, 14, 16, 20, 21, and Requests for
Production of Documents Nos. 1-5, 7-9, 18-22.

Accordingly, Walgreens shall provide plaintiff with the
following information on or before March 22, 2011:

1.  Answers to Interrogatory Nos. 22 and 23 (i.e., all
information, including all communications, such as emails and
internal memoranda, regarding plaintiff's March 2010 meeting
with Morgan).

2.  Document Production responsive to Document Request Nos.
6 (i.e., Authenticator ID reports for all stores in the New
Hampshire district for 2009 and 2010.  In the alternative,
Walgreens shall supply plaintiff with whatever reports the loss-
prevention person ran while investigating plaintiff's store that

enabled her to discern changes to authenticator ID passwords for his employees); and 15 (i.e., Opening Statements for the Maine District for the period September 2008 and 2009).

SO ORDERED.

_____
Landya B. McCafferty
United States Magistrate Judge

Dated:  March 1, 2011

cc:  Gregory A. Manousos, Esq.
     John P. Sherman, Esq.
     Jeffrey S. Siegel, Esq.