UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

**John Ingalls**

v.                              Case No. 10-cv-242-PB
                                Opinion No. 2011 DNH 205

**Walgreen Eastern Co., Inc.**

MEMORANDUM AND ORDER

In this diversity action, John Ingalls brings suit against his former employer, Walgreen Eastern Co. ("Walgreens"), alleging wrongful termination and intentional infliction of emotional distress. Walgreens moves for summary judgment. For the reasons provided below, I grant the motion.

I. BACKGROUND

Ingalls worked for Walgreens from February 2001 until March 26, 2010, when Walgreens terminated his employment. He was initially hired as an assistant manager, promoted to the position of an executive assistant manager in June 2002, and again promoted in December 2003 to the position of a store manager. He was manager of a store in Rochester, New Hampshire from October 2004 until February 2010, when he was transferred to the Dover, New Hampshire store.

Through 2009, Ingalls received positive reviews for having met or exceeded goals in every job performance category.  Until his termination, Walgreens had never disciplined him or even warned him about his job performance.  In fact, he received praise and salary increases for managing stores that ranked among the highest in his district and the country in terms of revenue and earnings.

In July 2006, the roof of a Walgreens store in Exeter, New Hampshire, partially collapsed during a rain storm.  Subsequently, Anne O'Herren, Ingalls' district manager, transferred some of the inventory from the Exeter store to other local stores, including the store Ingalls was managing.  O'Herren contacted Ingalls about the transfer, telling him to place the transferred inventory on the shelves to be sold to the public, and asking that he not share that information with anyone else.  O'Herren Dep. at 51, 55, Doc. No. 44-5.

Ingalls alleges various wrongdoings arising out of the inventory transfer.  He contends that Walgreens claimed the damage to its Exeter store as a "total loss" for insurance purposes, despite having transferred a portion of the inventory to other stores.  In addition, he alleges that the inventory

transfer violated Walgreens' internal policies and procedures, as well as state and federal laws prohibiting the transfer of tobacco and pharmaceutical products in this manner.

Ingalls remained silent about the July 2006 events until the fall of 2009, when Walgreens changed the way it calculated certain fees and employee bonuses. The change had a negative impact on the bonuses that Ingalls and his assistant managers received. Ingalls voiced his disagreement with the changes to members of Walgreens' upper management team. At that time, he also discussed the matter with Caroline Morgan, who was his "community leader."[1] When she expressed admiration for his boldness in standing up to upper management, Ingalls explained that he could afford to be bold because "if they do something to me, I'm going to let the ATF and the IRS know what they did with that merchandise in the Exeter store . . . ." Ingalls Dep. at 161-62, Doc. No. 44-1. He then explained to her that some of the merchandise from the Exeter store, including tobacco, was

---

[1] In his complaint, Ingalls avers that Morgan, as his "community leader," was "his direct supervisor." Compl. ¶ 40, Doc. No. 1-1. Morgan denies that she was Ingalls' supervisor. Morgan Dep. at 16, Doc. No. 42-7. She explained in her deposition that a community leader does not supervise store managers, but only provides coaching and mentoring, and that a district manager is the one who directly supervises store managers. Id. Ingalls has not produced any evidence to challenge Morgan's denial.

transferred to his store.  Id.  In his objection to the motion
for summary judgment, Ingalls characterizes his statements to
Morgan as "explain[ing] that it was unlikely – in his opinion –
that he would be fired because [of] what he knew regarding the
Exeter inventory."  P.'s Obj. to D.'s Mot. for Summ. J. at 10,
Doc. No. 44.

In February 2010, Morgan became the manager of the
Rochester store, while Ingalls went to the Dover store.  At that
time, the two had another conversation on the subject of
"standing up" to upper management.  Ingalls again told her, "if
they keep coming after me, then I'm going to tell the IRS and
the ATF about what happened in the Exeter store."  Ingalls Dep.
at 164-65, Doc. No. 44-1.  Although Ingalls speculates his
termination resulted from Morgan reporting these conversations
to someone in upper management, Morgan does not recall having
such conversations with Ingalls and, more importantly, denies
reporting either conversation to anyone at Walgreens.  Morgan
Dep. at 57, 81-82, Doc. No. 42-7.

Shortly after Morgan began managing the store where Ingalls
had worked, she learned that Ingalls had violated Walgreens'
policy regarding mandatory in-store, computer-based, employee

training ("PPLs").  Some of the training sessions are required
by law.  After noticing that the training computer was unplugged
and covered up in the photo lab, Morgan spoke with one employee,
who informed her that at least some of the employees at the
store did not do their own training.  Id. at 99-100.  The
employee stated that Ingalls had instructed her to complete
training sessions for others and that he had completed some of
the training sessions himself.  Id.; Brule Dep. at 24-25, Doc.
No. 42-9.

      Morgan then contacted Walgreens' loss-prevention department
to report the violation.  The loss-prevention investigator
conducted a formal investigation, which led her to conclude that
Ingalls had violated the company's training policy.  In
addition, the investigation turned up evidence that Ingalls had
engaged in further misconduct.  Specifically, some employees
reported that Ingalls often permitted hourly employees to work
"off the clock" and had altered time cards to avoid having to
pay overtime.  Those actions violated both Walgreens' policy and
the laws requiring that hourly employees be paid for time
worked.  The investigator reviewed at least one video confirming
that Ingalls manually removed hours an employee had worked from

the employee's time card.  Love-Searles Aff. ¶ 6, Doc. No. 42-11.

On March 26, 2010, Ingalls met with his supervisor, district manager Gregory Paramantgis, and the loss-prevention investigators to discuss the alleged misconduct.  During the meeting, Ingalls signed the following written statement:

> I spoke with [Loss Prevention] today in regards to personal emails on my work computer. We also discussed MGT [Assistant Manager] overtime by Mr. Menard. He stayed and worked extra hours off the clock. I also took responsibility for PPLs done for interns who were away on leave. I stated that the PPL issue was how I was trained to do it. Payroll was adjusted to stay within the forty hours per week under certain instances. I felt the pressure to complete the tasks needed, and was told to get it done. I went into the authenticator and changed passwords to complete them. In regards to Mr. Menard he worked off the clock not by being asked to but because he felt he needed to. I would guess that he worked maybe 10 hours per month to complete his tasks. I also audited MGT time cards to stay within the forty hours per week time frame.

Ingalls Statement, Doc. No. 42-32.[2]  Ingalls then expressed his belief that the investigation was a "witch hunt," adding, "I can't believe this.  Walgreens commits insurance fraud and you're investigating me for this."  Ingalls Aff. ¶¶ 20-21, Doc.

---

[2] During his deposition, Ingalls retreated from his admissions in the written statement.  <u>See</u> Ingalls Dep. at 99, 103-107, Doc. No. 44-1.  He stated that some admissions were not based on his personal knowledge, but rather on what investigators had reported to him.  <u>See</u> <u>id.</u>

No. 44-2.  After conferring with several members of Walgreens'
upper management team via telephone, Paramantgis informed
Ingalls that Walgreens was terminating his employment due to the
results of the investigation and Ingalls' admission of
misconduct.

After he was fired, Ingalls called ATF to report his belief
that Walgreens had violated laws regulating the transfer of
tobacco and had committed insurance fraud.  He also filed a
whistleblower form with the IRS.  Neither agency has responded
to the complaints.

## II.  <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate when the record reveals "no
genuine dispute as to any material fact and that the movant is
entitled to judgment as a matter of law."  Fed. R. Civ. P.
56(a).  The evidence submitted in support of the motion must be
considered in the light most favorable to the nonmoving party,
drawing all reasonable inferences in its favor.  <u>See</u> Navarro v.
Pfizer Corp., 261 F.3d 90, 94 (1st Cir. 2001).

A party seeking summary judgment must first identify the
absence of any genuine issue of material fact.  Celotex Corp. v.

7

Catrett, 477 U.S. 317, 323 (1986).  The burden then shifts to
the nonmoving party to "produce evidence on which a reasonable
finder of fact, under the appropriate proof burden, could base a
verdict for it; if that party cannot produce such evidence, the
motion must be granted."  Ayala-Gerena v. Bristol Myers-Squibb
Co., 95 F.3d 86, 94 (1st Cir. 1996); see Celotex, 477 U.S. at
323.


### III.  ANALYSIS

Ingalls asserts state common law claims for wrongful
termination and intentional infliction of emotional distress.
Walgreens seeks summary judgment, arguing that: (1) the wrongful
termination claim must be dismissed because there is no public
policy protecting the conduct for which Ingalls claims he was
fired; and (2) the intentional infliction of emotional distress
claim is barred by the state's workers' compensation law, and,
in the alternative, there is no evidence of extreme and
outrageous conduct to support the claim.  I address each
argument in turn.

A.   **Wrongful Termination**

Ingalls alleges that he was wrongfully terminated because he "knew too much" about Walgreens' allegedly unlawful actions in relation to the Exeter inventory transfer, and because he informed his superior that he would report those actions to the government if he was ever fired.  Walgreens argues that it terminated Ingalls' employment for a legitimate reason – admitted egregious violations of state and federal law and company policies.  I grant Walgreens' motion for summary judgment on the wrongful termination claim because there is no public policy protecting the conduct for which Ingalls claims he was fired.

Under New Hampshire law, the claim of wrongful termination exists as a judicially crafted exception to the common law doctrine of employment at will.  See Harper v. Healthsource N.H., Inc., 140 N.H. 770, 774 (1996).  Under that doctrine, "hiring is presumed to be at will and terminable at any time by either party." Monge v. Beebe Rubber Co., 114 N.H. 130, 132 (1974).  To succeed on a wrongful discharge claim, a plaintiff must establish "(1) [that] his termination was motivated by bad faith, retaliation or malice; and (2) that he was terminated for

performing an act that public policy would encourage or for
refusing to do something that public policy would condemn."
MacKenzie v. Linehan, 158 N.H. 476, 480 (2009) (citing Lacasse
v. Spaulding Youth Ctr., 154 N.H. 246, 248 (2006)).

A public policy necessary to support a wrongful termination
claim may derive from either a statutory public policy or a non-
statutory public policy.  Cilley v. N.H. Ball Bearings, Inc.,
128 N.H. 401, 406 (1986).  Non-statutory public policies are
determined by "the interests of society and . . . the morals of
the time."  Harper, 140 N.H. at 775; see also Cilley, 128 N.H.
at 406.  A statutory public policy is one that is embodied in a
statute.  See, e.g., Cloutier v. Great Atl. & Pac. Tea Co.,
Inc., 121 N.H. 915, 923 (1981).  "Although ordinarily the issue
of whether a public policy exists is a question for the jury, at
times the presence or absence of such a public policy is so
clear that a court may rule on its existence as a matter of law
. . . ."  Short v. Sch. Admin. Unit No. 16, 136 N.H. 76, 84
(1992) (citation omitted).  Such is the case here.

Ingalls alleges that he was terminated "because he
performed an act that public policy would encourage including,
but not limited to, identifying the Company's potentially

fraudulent and/or criminal conduct to his supervisor."  Compl. ¶ 53, Doc. No. 1-1.  The evidence, however, establishes at most that Ingalls was terminated not for reporting the allegedly wrongful conduct to a supervisor, but for threatening to report the alleged wrongdoings to the government in the event Walgreens ever fired him.

Specifically, Ingalls told Morgan, whom he refers to as his supervisor, that "if [members of Walgreens' upper management] do something to me, I'm going to let the ATF and the IRS know what they did with that merchandise in the Exeter store . . . ."  Ingalls Dep. at 161-62, Doc. No. 44-1.  Ingalls knew about Walgreens' allegedly wrongful actions regarding the Exeter inventory for more than three years prior to that statement.  He threatened to disclose the harmful information after Walgreens adopted measures that would reduce his bonuses, and then only in the event Walgreens ever fired him.  His actions were not designed to protect any interests other than his own.  In essence, Ingalls dared Walgreens to fire him, and Walgreens called his bluff.[3]

---

[3] Even according to Ingalls' theory of the case, he was not fired because of what he knew about the Exeter incident, but in spite of it.  If Walgreens wanted to prevent Ingalls from exposing the

Public policy may support the right of an employee to be free from retaliation for exposing his employer's fraudulent conduct.  It does not, however, support the right of an employee to keep quiet about the fraudulent conduct for years and then to threaten exposure as a bargaining chip in an effort to keep his job.  This is precisely what Ingalls did.  Therefore, his claim of wrongful termination fails as a matter of law.[4]

---

allegedly harmful information, it had an incentive to keep him as an employee, rather than to terminate him and risk the exposure.

[4] Even if Ingalls has articulated a public policy sufficient to give rise to a cause of action for wrongful discharge, he has not established that he was terminated because of actions he took in furtherance of that policy.  His assertion that he was terminated for reporting Walgreens' alleged wrongdoing in transferring the Exeter inventory is pure speculation.  First, he does not allege that Morgan, the person to whom he disclosed the information, was involved in the decision to fire him.  In fact, at the time of his termination, Morgan was not his superior but rather held the same position as Ingalls.  Second, he presents no evidence that Morgan communicated to Walgreens' upper management his threat to disclose the harmful information in the event he was terminated.  Without evidence that the people who made the decision to fire him knew about his threat, Ingalls cannot establish the causation required to support a wrongful termination claim.  See Velazquez-Ortiz v. Vilsack, 657 F.3d 64, 72-73 (1st Cir. 2011) (holding that an employee's Title VII retaliation claim failed because there was no evidence that the employer knew about the employee's protected conduct prior to taking the adverse employment action).

**B.**   <u>**Intentional Infliction of Emotional Distress**</u>

Ingalls also alleges that "Walgreens, through its employees and agents, has engaged in extreme and outrageous conduct including, but not limited to, illegal and/or fraudulent activities that it required its employees, including Ingalls, to keep quiet as a condition of maintaining his employment." Compl. ¶ 36 (Count II), Doc. No. 1-1.  Walgreens argues that Ingalls' intentional infliction of emotional distress claim is barred by New Hampshire's workers' compensation statute, and, in the alternative, that Ingalls has not established extreme and outrageous conduct.

I need not decide whether New Hampshire's workers' compensation law bars Ingalls' claim, because Walgreens' alleged conduct was not extreme and outrageous as a matter of law.  To prove intentional infliction of emotional distress, Ingalls must establish that the defendant "by extreme and outrageous conduct intentionally or recklessly cause[d] [him] severe emotional distress . . . ." Morancy v. Morancy, 134 N.H. 493, 496 (1991) (quoting Restatement (Second) of Torts § 46 (1965)); <u>accord</u> Konefal v. Hollis/Brookline Coop. Sch. Dist., 143 N.H. 256, 260 (1998).  To be extreme and outrageous, the alleged conduct must

be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Moss v. Camp Pemigewassett, Inc., 312 F.3d 503, 511 (1st Cir. 2002) (quoting Restatement (Second) of Torts § 46, cmt. d (1977) and citing Konefal, 143 N.H. at 260); see Jarvis v. Prudential Ins. Co. of Am., 122 N.H. 648, 652 (1982) (referencing the definition of "outrageous conduct" in Restatement (Second) of Torts § 46).

Ingalls alleges that Walgreens engaged in extreme and outrageous conduct by terminating his employment when he indicated that he would no longer "keep quiet" about the illegal activities regarding the Exeter inventory, as he was asked to do.  The same fallacy that afflicts his wrongful termination claim plagues this one, namely that he has not established that he was fired because he reported any misconduct.  The evidence shows that, at most, he was terminated for threatening to report the alleged misconduct in the event he was ever fired.

Even if Ingalls was fired for reporting the company's alleged wrongdoings to a superior, this is not the type of "atrocious" conduct that exceeds "all possible bounds of

decency." Moss, 312 F.3d at 511; see Konefal, 143 N.H. at 260
(holding that defendant's failure to renew plaintiffs'
employment contract due to plaintiff's non-union status may
indicate "an improper motive that may support a claim for
wrongful termination," but it would not support a claim for
intentional infliction of emotional distress).  "Although
discharging an employee . . . may be illegal and reprehensible,
a great deal more is required to approach outrageous conduct.
Such conduct is bad conduct, but it is not outrageous and
intolerable conduct." Konefal, 143 N.H. at 260 (quoting Lococo
v. Barger, 958 F.Supp. 290, 298 (E.D. Ky. 1997)).  Moreover,
neither Ingalls' complaint nor his responsive pleadings contain
"references to any specific instances of emotional distress," an
element of the tort.  See id. at 261.  Therefore, Walgreens is
entitled to summary judgment on the claim.

## IV.  **CONCLUSION**

For the reasons stated above, I grant Walgreens' motion for
summary judgment (Doc. No. 42) on both counts of the complaint.
The clerk shall enter judgment accordingly and close the case.

SO ORDERED.


                                        /s/Paul Barbadoro
                                        Paul Barbadoro
                                        United States District Judge
December 13, 2011


cc:   John P. Sherman, Esq.
      Gregory A. Manousos, Esq.
      Jeffrey S. Siegel, Esq.

16